## 53600. FRANKLIN v. THE STATE.

BANKE, Judge.

The defendant was indicted for violation of the Georgia Controlled Substances Act after being found in possession of nearly three thousand pounds of marijuana. The defendant moved to suppress the evidence as the fruit of an illegal arrest. He now appeals from the trial court's dismissal of his motion to suppress.

The defendant was the pilot of a plane which was importing marijuana into the United States. The plane became lost in bad weather and landed at Anniston, Alabama. Before leaving the Anniston airport, the defendant aroused the authorities' suspicion as to the nature of his cargo, and local police attempted unsuccessfully to stop him before he hastily returned to the skies, bound for Atlanta.

Georgia authorities were notified of the plane's approach, and a radio call went out to Fulton County police officers near the Charlie Brown Airport to hold the plane for authorities in Alabama.

Police officers arrived at the airport moments before the defendant's plane landed, blocked the taxiway, and, armed with shotguns, awaited the defendant's arrival. When the defendant landed and neared their cars, he was ordered to get out of the plane. While he was doing so, officers saw the marijuana inside the plane and, according to their version of the facts, arrested the defendant at that time.

The defendant contends that when his vehicle's motion was blocked by police cars and he was accosted by officers armed with shotguns an arrest had already occurred. It is the state's contention that the defendant was not arrested until *after* the officers saw his cargo and that the armed blockage of the taxiway amounted merely

to an "investigatory stop," as allowed by Terry v. Ohio, 392 U. S. 1 (1968). Because probable cause for an arrest did not exist until the marijuana was actually spotted inside the plane, we must determine whether sufficient evidence existed for a determination by the trial judge that the defendant's initial confrontation with the police was in the context of a Terry stop.

1. The defendant landed in Anniston in a World War II vintage aircraft of a type known to be regularly used in drug trafficking. He landed without contacting the control tower, as is customary, and drove his aircraft much faster than is normal on the ramp. He refused to disembark from the plane when asked to do so by Anniston police and took off rapidly, without going through the customary aircraft pre-flight checklist. Based on these observations, Anniston police had an articulable suspicion that contraband was present in the aircraft and thus had the right to detain the defendant for questioning under Terry.

The defendant's plane was followed on radar from Anniston to Atlanta. As Fulton County policemen were approaching Charlie Brown Airport, they were notified by radio that the aircraft had dropped off radar at Hartsfield Airport and appeared to have landed. An officer arrived at the Charlie Brown Airport to see a plane make a low sweep without setting down. There is evidence from which the trial judge could find that the defendant's aircraft was sufficiently determined by Fulton County police to be that which departed from Anniston. Because Anniston officials had sufficient cause to stop the plane under Terry, Fulton County police who were notified by radio to hold the plane for Alabama authorities also had sufficient reason to effect a Terry stop. Silas v. State, 133 Ga. App. 560 (1) (211 SE2d 609) (1974); Quinn v. State, 132 Ga. App. 395 (1) (208 SE2d 263) (1974).

2. Time of arrest is a question of fact which depends upon an evaluation of the testimony by the trial judge. Rios v. United States, 364 U. S. 253, 262 (1960). There is evidence to support the trial judge's finding that an arrest did not occur until the police saw marijuana in plain view. "Factual and credibility determinations of this sort made by a trial judge after a suppression hearing must be

accepted by appellate courts unless such determinations are clearly erroneous. See Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1972), and United States v. Watson, 469 F2d 362 (5th Cir. 1972)." *Johnson v. State,* 233 Ga. 58 (209 SE2d 629) (1974).

Blocking the plane with police cars was a reasonable manner of stopping it under the circumstances, considering the possibility of flight by the defendant in a highly mobile aircraft. An investigatory stop is not automatically an arrest simply because an officer is armed with a shotgun. United States v. Worthington, 544 F2d 1275 (5th Cir. 1977); United States v. Maslanka, 501 F2d 208, 213, n. 10 (5th Cir. 1974). It is often necessary for the police to approach a person with a drawn weapon in a suspiciously dangerous situation in order to protect the physical well-being of both police officers and the public. In fact, in a situation very similar to that sub judice, the United States Court of Appeals for the Fifth Circuit recently held that officers acted reasonably in stopping a pilot suspected of transporting marijuana by blocking his plane and ordering him at riflepoint to disembark. United States v. Worthington, supra. The officers' actions in the case at bar in merely holding shotguns is certainly less offensive than in Worthington, where a high-powered rifle was aimed at the pilot.

The Fourth and Fourteenth Amendments to the Constitution prohibit only *unreasonable* searches and seizures. Is a seizure unreasonable simply because the police have taken the precaution to arm themselves in light of unknown danger? We are not prepared so to hold. If we were to reach a contrary result, law enforcement officers would be required to risk their lives by not drawing weapons until drawn upon, unless a hasty legal analysis convinced them that probable cause existed for an arrest.

From *Holtzendorf v. State,* 125 Ga. App. 747, 750 (188 SE2d 879) (1972), the defendant quotes, "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." With this statement we have no quarrel; the defendant was "seized" by Fulton County officers when his aircraft's passage was blocked. The

*Holtzendorf* quote was taken verbatim from Terry v. Ohio, *supra,* another case where a defendant was seized. However, the court in Terry proceeded to hold that the seizure was not unreasonable under the Fourth Amendment — as we have done here. Therefore, the quote from *Holtzendorf* does not support the defendant's contention that he was necessarily illegally arrested.

The holding of this court in *Kelly v. State,* 129 Ga. App. 131 (2) (198 SE2d 910) (1973), does not conflict with our finding that no arrest occurred prior to discovery of the marijuana. In Division 2 of *Kelly* this court simply held that there was no "articulable suspicion" to support a Terry stop of the defendant's automobile.

*Judgment affirmed. Bell, C. J., Deen, P. J., Marshall and McMurray, JJ., concur. Webb, J., concurs in the judgment only. Quillian, P. J., and Shulman, J., dissent. Smith, J., disqualified.*

ARGUED MARCH 8, 1977 —DECIDED JULY 1, 1977 — REHEARING DENIED JULY 19, 1977 —

*Chambers, Siefferman, Robinson & Cooper, Floyd E. Siefferman, Jr.,* for appellant.

*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Donald J. Stein, R. David Petersen, Assistant District Attorneys,* for appellee.

QUILLIAN, Presiding Judge, dissenting.

I concur in the dissent of Judge Shulman. However, I must also dissent from the First Division of the opinion. It should be noted that the majority based its. opinion on the "two-step" premise: (1) *"Anniston police* had an articulable suspicion that contraband was present in the aircraft and thus had the right to detain the defendant for questioning under Terry [Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889)] . . . [thus] (2) Because Anniston officials had sufficient cause to stop the plane under Terry, Fulton County police who were notified by radio to hold the plane for Alabama authorities also had sufficient reason to effect a Terry stop." (Emphasis supplied.)

Returning to the Anniston Airport, I observe that it was the FAA Traffic Control Specialist, Mr. Bennett, whose "suspicion" was aroused and not the suspicion of the police. Mr. Bennett stated: "It wasn't so much that the aircraft did not call me. However, that was a contributing factor. The main thing that really aroused my suspicions was when it was confirmed that it was this World War II-type aircraft, which we have been instructed to be on the lookout for. This was what confirmed my suspicions and led me to picking up the telephone and calling the police. The other circumstances, such as how fast he might have been going, was just a contributing factor. . ." Mr. Bennett admitted that the aircraft was not required by any rule, regulation or law, to call him.

When the police arrived at the airport they reported to the terminal and Mr. Bennett directed them to the aircraft which had parked on the "ramp underneath the only burning white light that we have." Mr. Bennett observed ". . . one figure disembarked from the aircraft and went out to the police and apparently held some conversation with them . . . the figures turned and one went back toward the aircraft . . . [Mr. Bennett] reentered the building . . . [and] heard the aircraft engine start . . . saw it taxi rapidly to the end of the runway without any run-up procedure and immediately start taking off." He also stated that it was a "pilot option" to use a "rolling takeoff" as opposed to a "dead stop" takeoff.

Officer Hudson of the Oxford Police Department of Anniston, Alabama, was the policeman who responded to the FAA call. He was asked: "What call did you receive? A. That an airplane had landed without authorization." He was directed to the airplane and testified: "When we got out of the car, a white male approached me on the passenger side of the car and asked me where he was, and I told him he was in Oxford, Alabama. At that time he said he was bound for Atlanta, Georgia from Miami, Florida, and that his instruments had been knocked out in the rainstorm earlier that night." There were three other officers at the scene. He returned to his radio to see if FAA officials were going to meet with him about the unauthorized landing. At that time the "white male" and the three police officers returned to the plane. Officer

Hudson then went up to the door and tried to open it and when the right engine started, moved away and shouted to the pilot to stop and get out of the plane. The other police officers were just watching. The pilot started the second engine and taxied down the taxi strip. Hudson returned to his police car, outside the fence, and drove after the airplane with his blue lights on, but "[b]y the time [they] got to a place where [they] could cross and get on that runway [which the plane was on], the plane was already off the ground." Officer Hudson now knows that FAA authorization was not required to land.

From the above facts it is evident that not only did *the police* in Anniston, Alabama, not have "articulable suspicion that contraband was present," they *had no suspicion* of any activity other than someone had made "an unauthorized landing." Further, the FAA official was the only individual who had any "suspicion," and he is correct in his terminology. It was only "suspicion." The next important step is that, in effect, *a Terry stop occurred with defendant's plane and its personnel while it was in Anniston, Alabama,* and the personnel in the airplane explained why they were there.

In sum, the Anniston police basis for their Terry-type "stop" was based solely on the "suspicion" of an FAA employee, which was not communicated to the police. "Mere unconfirmed suspicion is not the criteria upon which probable cause is based." United States v. Jackson, 533 F2d 314 (5) (6th Cir. 1976). The police were given the spurious offense of "unauthorized landing" as a subterfuge for a Terry-type "stop" because they did not have "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion." Terry v. Ohio, 392 U. S. 1 (19) (88 SC 1868, 20 LE2d 889). Regardless of the basis used, the Terry-type "stop" occurred and the explanation was given and the defendant departed. Any attempt by the Anniston police thereafter to stop the defendant from departing was based solely on their false belief that defendant had committed a violation of FAA origin called "unauthorized landing."

Not only was the basis of the stop false, and based upon "suspicion" alone, without any "articulable facts"

relating to drug trafficking, which was not relayed to the arresting officers in Anniston or Fulton County, but the premise of the majority that the Anniston officials' right to make a Terry-type *"stop"* would be sufficient to permit the Fulton authorities to make a Terry-type "stop," ignores the fact that Fulton authorities — in effect, were directed to *make an arrest,* not a stop. Lieutenant Deariso of the Fulton County Police Department testified they were "asked to hold the plane for authorities in Alabama." When questioned as to what he intended to do, he testified: "Q. Even before you directed Mr. Franklin to get out of the cockpit of the airplane, before he even came up to a stop at the cars, you had planned to get him out and hold him, had you not sir? A. Yes, sir. Q. Regardless of whatever facts you might have seen or heard or smelled or what-have-you, you were going to — you had pre-planned what you were going to do? A. We intended to try to hold him for the Alabama authorities, yes, sir."

It is crystal clear that the "hold" order of "Alabama authorities" was an arrest order and not a Terry-type "stop" that previously had been carried out. Even if — as the majority states, the Fulton County Police had authority to make a Terry-type "stop," what were they supposed to do? What questions were they going to ask? No facts had been communicated to them. This was not a request to make a Terry stop but an arrest order and the Fulton County Police carried out an illegal arrest of the defendant for a nonexistent crime of "unauthorized landing." Further, I have searched the record and can find no mention of Alabama *police* authorities making any request to arrest the defendant. What I did find was that the Anniston FAA official called Birmingham, and Birmingham in turn called the Atlanta Air Route Traffic Control office. The only evidence in the record showing communications between Alabama and Georgia was in FAA channels.

The next question is when was the arrest effected? This is the issue that particularly concerns me. What effect will this "whole court" opinion have on the law of search and seizure? The majority opinion has placed the time at when a stop becomes an arrest at a period of time too long after the original stop to justify searches formerly

thought to be legal.

It is "horn-book" law that a lawful search may be made following a lawful arrest. Our Code states that "[i]f the defendant voluntarily submits to being considered under arrest . . . the arrest is complete." Code § 27-201. Here the order to stop and hold the defendant for "Alabama authorities," was an arrest order. The arrest was complete the instant "the liberty of another to come and go as he pleases is restrained, no matter how slight such restraint may be." *Caito v. State,* 130 Ga. App. 831 (1) (204 SE2d 765).

Our Supreme Court has discussed this issue as follows: "An arrest is accomplished whenever the liberty of another to come and go as he pleases is restrained, no matter how slight such restraint may be. The defendant may voluntarily submit to being considered under arrest without any actual touching or show of force, and the arrest is complete. [Cits.] The mere fact that the officer testifying with regard to these occurrences stated at one place in his testimony that after he had completed the search he 'then placed him under arrest' does not alter the fact that the defendant was actually under arrest from the moment the police officers approached the automobile which he was driving and caused him to alight therefrom under the force and restraint of drawn guns," as in this case. *Clements v. State,* 226 Ga. 66, 67 (2) (172 SE2d 600); *Strong v. State,* 231 Ga. 514, 518 (202 SE2d 428); *Holtzendorf v. State,* 125 Ga. App. 747, 750 (188 SE2d 879); *Brooks v. State,* 129 Ga. App. 109, 110 (198 SE2d 892); *Flournoy v. State,* 131 Ga. App. 171 (2) (205 SE2d 473); *Hill v. State,* 140 Ga. App. 121, 124 (230 SE2d 336).

Not only has the majority opinion not followed prior decisions of this court but the result reached is contrary to the holdings of our Supreme Court in *Clements* and *Strong,* supra. If these cases did not provide sufficient precedent, we should have turned to the U. S. Supreme Court's holding in Henry v. United States, 361 U. S. 98 (80 SC 168, 4 LE2d 134), where federal officers investigating suspected criminal activity observed what they thought to be contraband in a car. When the car departed, "the agents followed it and finally, when they met it, waved it to a stop." Id. at 99. The court held ". . . the arrest took

place when the federal agents stopped the car." Id. at 103. Other federal courts apply the same rule. In Carpenter v. Sigler, 419 F2d 169 (8th Cir. 1969), the court held the defendant "was 'seized' when the police officers signaled him to pull to the curb by the use of their flashing red light." Id. at 171. See also United States v. Nicholas, 448 F2d 662 (8th Cir. 1971).

In this connection, the U. S. Supreme Court has held that "[t]he Fourth Amendment [prohibition against unreasonable searches and seizures] applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Ponce, 422 U. S. 873 (4) (95 SC 2574, 45 LE2d 607). Thus, whether we categorize this stop as a "seizure" or an "arrest" it is immaterial if probable cause is lacking.

If we assume that the request to "hold" the defendant was relayed by Alabama police authorities, the U. S. Supreme Court dealt with a similar situation in Whiteley v. Warden, 401 U. S. 560 (91 SC 1031, 28 LE2d 306), wherein a sheriff, acting on a tip from an informer, made out a complaint against the defendant and another person charging them with burglary. A police radio bulletin named and described the defendant, the car he was driving, and the amount and type of money taken. Relying on the radio bulletin, a police officer in another county made a warrantless arrest of the defendant — as was done in this case. The court concluded that the officer who received the radio bulletin was "entitled to act on the strength of the radio bulletin . . . [as] officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest. In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the

informer's tip that [the defendants] committed the crime. Therefore [defendant's] arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial." Id. at 568-569.

In essence, the court held that an arresting officer is entitled to act upon receipt of a radio bulletin, but the validity of his act depends upon the validity of the initiating officer's acts. If the initiating officer had the right to make an arrest, he could properly delegate the arresting function via the radio bulletin to a fellow police officer to make the arrest. United States v. Gaither, 527 F2d 456, 458 (6) (4th Cir. 1975); United States v. Robinson, 536 F2d 1298, 1300 (9th Cir. 1976); see also Brisbane v. State, 233 Ga. 339, 343 (211 SE2d 294); Phillips v. State, 233 Ga. 800 (213 SE2d 664); Creecy v. State, 235 Ga. 542 (221 SE2d 17). In this case the initiating officials had no basis for issuance of an arrest order, particularly for drugs.

In summary, the instant case follows one mistake upon another. First, there was no "founded suspicion" or "specific articulable facts" to base a Terry-type stop — only "suspicion." Second, only the FAA official had any "suspicion." Third, that "suspicion" was not communicated to the police. Fourth, a spurious offense that never existed was communicated to the police to make a "Terry-type" stop. Fifth, a "Terry-type" stop was made in Anniston, Alabama, and the police were given the reasons for their presence at that airport. See Adams v. Williams, 407 U. S. 143, 146 (92 SC 1921, 32 LE2d 612). Sixth, the attempt to stop defendant from leaving the Anniston airport was based on the nonexisting offense of "unauthorized landing." Seventh, there is no evidence that Alabama police authorities issued the "stop" and "hold" order. FAA officials in Alabama communicated with Georgia FAA officials. Eighth, Fulton County officials were directed to arrest the defendant — not to make a Terry-type stop. Ninth, regardless of directions from "Alabama authorities," the defendant was arrested at that point in time where the police blocked his path with police cars, stopped his airplane, exhibited two shotguns, and ordered him to leave the airplane. Henry v. United States, 361 U. S. 98, 103, supra; Beck v. Ohio, 379

U. S. 89, 91 (85 SC 223, 13 LE2d 142); Terry v. Ohio, 392 U. S. 1 (88 SC 1868, 20 LE2d 889); *Clements v. State,* 226 Ga. 66, 67, supra; *Strong v. State,* 231 Ga. 514, 518, supra. The arrest being without probable cause, the search that followed was illegal.

I would reverse.

SHULMAN, Judge, dissenting.

I respectfully dissent. The point at which I must depart from the majority is the holding that appellant was not arrested until the police spotted marijuana inside the plane. In my view, the arrest occurred earlier, when police blocked the taxiway and, armed with shotguns, ordered appellant to shut down his engines and leave the aircraft. As Judge Goldberg stated in his excellent dissent in United States v. Worthington, 544 F2d 1275 (5th Cir., 1977), cited by the majority in this case, ". . . when a police-citizen confrontation is accompanied by a greater degree of force and restraint directed toward the citizen than is ordinarily or necessarily associated with a policeman's request to stop and answer some questions, it becomes the type of seizure that must rest on antecedent probable cause, whether or not it is within the traditional definition of arrest. From that perspective, I conclude that the seizure here required the traditional probable cause basis." At 1282.

The majority addresses this issue by citing Worthington, supra, and United States v. Maslanka, 501 F2d 208 (5th Cir., 1974). In the first place, this court is not bound by precedent from the U. S. Court of Appeals; they are merely persuasive. Second, I am convinced that Judge Goldberg's analysis in Worthington is correct and that of the majority incorrect. Third, the question of the degree of force used was not directly addressed in the body of the opinion in Maslanka. In the footnote cited by the majority here, the court noted that the arresting officer was alone on a country road with three men he had chased at speeds around 100 mph. In addition, the court noted, he had probable cause to arrest the driver, at least, for speeding, and did so prior to the discovery of marijuana.

The facts in Worthington are also much different from those here. There, agents were informed that a young man

was going to transport drugs in a particular plane during a specified time period. Pursuant to that tip, several details of which had been verified, the agents followed Worthington for more than one day, bugged his plane, and finally confronted him when both planes were forced down by bad weather. In the instant case, the arresting officers knew nothing about appellee's activities, just that Alabama officials wanted him held. They saw a plane land, blocked its movement completely and confronted appellant with the threat of deadly force for the avowed purpose of "holding him for Alabama." I cannot accept that this procedure is consistent with a Terry investigative stop. With no information as to why they were acting, police officers armed with shotguns took custody of the appellant to "hold" him. That was an arrest and, since it preceded the discovery of the contraband, was not based on probable cause and was, therefore, illegal, requiring the suppression of the evidence seized. While the hands of the police should not be tied under clearly definable circumstances, reasonable and justifiable limitations should be applied.

I would reverse.