CALVIN WATKINS a/k/a Vincent Watkins
*v.* STATE OF MARYLAND

[No. 68, September Term, 1979.]

*Decided October 3, 1980.*

598

The cause was argued before SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ., and reargued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

Argued and reargued by *Gerald A. Kroop* for appellant.

Argued by *Deborah K. Handel, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Michael A. Anselmi, Assistant Attorney General,* on the brief, for appellee. Reargued by *Michael A. Anselmi, Assistant Attorney General,* for appellee.

DIGGES, J., delivered the opinion of the Court. ELDRIDGE, COLE and DAVIDSON, JJ., dissent. COLE, J., filed a dissenting opinion at page 610 *infra,* in which ELDRIDGE and DAVIDSON, JJ., join.

In the criminal cause now before us, petitioner Calvin Watkins challenges the denial of his pretrial motion to suppress evidence obtained as a result of police activity which he asserts violated his right under the fourth amendment to the United States Constitution to be secure from unreasonable searches and seizures. Since we conclude that the complained of police conduct was not an impermissible intrusion into the petitioner's personal security, we shall affirm the judgment of the Court of Special Appeals upholding his conviction for the illegal possession of a controlled dangerous substance.

The pertinent facts, agreed upon by the parties, can be

succinctly stated. On February 12, 1978, at approximately 4:40 p.m., Police Officer John McEntee received an official radio transmission directing him to go to the 2100 block of Barclay Street in Baltimore City to assist an unidentified foot patrolman who was "in pursuit of two suspects reported to be armed . . . ."[1] As Officer McEntee proceeded to that location in his marked cruiser, he overheard another transmission from the policeman on foot reporting that he had lost sight of the two suspects in the vicinity of the intersection of 21st and Barclay Streets. At the time of this second broadcast Officer McEntee, being within one block of that intersection, slowed his cruiser and observed 30 to 50 people throughout the 2000 block of Barclay, among whom were the petitioner and an unidentified person standing with him. As the police car approached, the petitioner's companion yelled "run, police" and Watkins in response did flee by running into and through an alley. Officer McEntee immediately alighted from his vehicle and while calling out several times for the runner to stop, gave chase for a distance of some three blocks where, upon overtaking petitioner, the officer attempted to grab him from behind. At that point, Watkins turned and struck Officer McEntee in the mouth with the back of his hand, and the struggle that followed culminated with the subduing of the petitioner in a prone position on the ground. While in that posture, when Watkins attempted to reach for his right lower leg, Officer McEntee patted the exterior of the sock area and identified the soft, pliable object within it not to be a weapon. Petitioner was then placed under arrest for assaulting the officer and the more intensive search which followed produced from his sock a brown paper bag containing 73 glassine packets of what was later determined to be heroin.

As it turned out, Mr. Watkins was not one of the armed suspects who had evaded the foot patrolman. He was, however, tried, convicted and sentenced in the Criminal Court of Baltimore (Arabian, J.) for the illegal possession of heroin in

---

1. We note from the transcript of the pretrial suppression hearing contained in the record, that Officer McEntee, at one point during his testimony, stated that the radio broadcast reported the fleeing persons to be "two black males."

sufficient quantity to indicate an intent to distribute that drug. The conviction was obtained only after a pretrial motion to suppress and exclude the heroin was denied, a ruling Watkins claimed on his appeal to the Court of Special Appeals constituted reversible error. That court, in an opinion written by Judge Liss, after determining that "[t]hese facts, as articulated by the police officer, were sufficient to raise a rational inference that the appellant may have been 'connected with criminal activity' ", concluded "that there was legal justification for the [*Terry*[2]] stop," and affirmed his conviction and sentence. *Watkins v. State,* 42 Md. App. 442, 446, 400 A.2d 1143, 1146 (1979). We granted certiorari.

In urging that this Court reverse the judgment, the petitioner advances two reasons why the heroin was impermissibly seized, either of which, he asserts, would dictate that it could not be used as evidence against him. First, Watkins argues that Officer McEntee did not possess sufficient articulable facts which authorized the investigatory stop of the petitioner. And, second, he contends that even assuming that the officer had the requisite predicate for detaining Watkins, it is unreasonable under the fourth amendment to the United States Constitution to use physical force to effectuate the stop. Petitioner rationalizes that if either of these contentions is true, then his assault of the officer was justified,[3] and his arrest for this crime was invalid, which in turn makes the article seized inadmissible in evidence since it was "fruit of the poisonous tree." *E.g., Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

We begin our analysis of the contentions raised by the petitioner with an examination of the principles established

---

**2.** Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

**3.** Petitioner relies for this conclusion on the common law doctrine that "one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary." Sugarman v. State, 173 Md. 52, 57, 195 A. 324, 326 (1937). However, since we conclude that Officer McEntee possessed authority to make an investigatory stop of the petitioner, we do not further consider this matter. For a discussion of the continuing viability of the common law principle articulated in *Sugarman,* see Rodgers v. State, 280 Md. 406, 373 A.2d 944 (1977), *cert. denied,* 434 U.S. 928 (1977); Annot., 44 A.L.R. 3d 1078 (1972).

by the Supreme Court of the United States in the landmark case of *Terry v. Ohio,* 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), which articulates the bedrock constitutional law largely determinative of the issues in this case.[4] In *Anderson v. State,* 282 Md. 701, 387 A.2d 281 (1978), this Court summarized the applicable law announced by the Supreme Court in that case:

> *Terry* dealt with the very narrow question of whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons when there is no probable cause to arrest him. Answering that question in the negative, the Court preliminarily rejected the notion that such investigatory detentions were not governed by the fourth amendment to the Federal Constitution. The Court observed that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" and that exploration of the outer surfaces of a person's clothing is a "serious intrusion upon the sanctity of the person ... and ... not to be undertaken lightly." The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." In determining whether the intrusion was justified at its inception, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." The reasonableness of an intrusion is to be assessed against an objective standard — whether "the facts available to the officer at the moment of the seizure or the search 'warrant a

---

4. The petitioner in the petition for writ of certiorari originally claimed that the Court of Special Appeals erred in assuming that Officer McEntee intended to stop rather than arrest him. Whatever the merit of this contention, the argument is foreclosed by the statement of facts, agreed upon by the parties pursuant to Maryland Rule 828 g, which places the arrest at a time subsequent to the stopping of the petitioner, as related in the text.

man of reasonable caution in the belief that the action taken was appropriate." [*Anderson v. State, supra* at 704-5, 387 A.2d at 283 (citations omitted).]

Though the *Terry* court did not specifically rule on the constitutional propriety of an investigative seizure, *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, *but see id.* at 32-33 (J. Harlan's concurring opinion), decisions subsequent to *Terry* have left no doubt as to the constitutionality of such detentions, given proper circumstances. *See Brown v. Texas,* 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975). "[T]he real thrust of *Terry* is directed at instances in which there is reasonable suspicion that someone is about to commit or has just committed a crime." *Anderson v. State, supra,* 282 Md. at 706, 387 A.2d at 284. Thus, it is the manifest need for "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat," *Terry v. Ohio, supra,* 392 U.S. at 20, reasonably creating in the mind of the officer "some quantum of individualized suspicion," *United States v. Martinez-Fuerte,* 428 U.S. 543, 560, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976); *Delaware v. Prouse,* 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), that must be balanced against "the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce, supra,* 422 U.S. at 878. See *Brown v. Texas, supra,* 443 U.S. at 50-51; *Delaware v. Prouse, supra,* 440 U.S. at 654-55.

Neither the *Terry* opinion, nor the Supreme Court decisions since that case, spell out with any precision the factors to be analyzed in determining whether the police officer had knowledge of specific and articulable facts justificatory of the detention of an individual on less than probable cause. The federal and state courts that have applied *Terry,* however, have commonly looked to several criteria in attempting to resolve whether the police officer had the requisite reasonable suspicion. This Court, for instance, in *Anderson v. State, supra,* 282 Md. at 707 n. 5, 387 A.2d at 285 n. 5, concluded that the character of the

area, the temporal and spacial proximity of the stop to the situs of the crime, and the appearance and conduct of the suspect were relevant in adjudging reasonable suspicion. Similarly, in *United States v. Wright,* 565 F.2d 486 (8th Cir. 1977), *cert. denied,* 435 U.S. 974 (1978), a case factually akin to the one at bar, the court relied on the following circumstances in determining that the police conduct was valid: a radio dispatch reporting that a robbery had just been committed, the proximity of the suspect to the reported crime, and the suspicious conduct of the defendant upon awareness of the police presence. *Id.* at 489. *Accord, Franklin v. United States,* 382 A.2d 20, 22 (D.C. 1978), *cert. denied,* 440 U.S. 948 (1979); Project, *Eighth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1977-78,* 67 Geo. L.J. 317, 354-55 (1978); Note, *Terry Revisited: Critical Update on Recent Stop-And-Frisk Developments,* 1977 Wis. L. Rev. 877, 886 (the six variables most often identified are appearance, conduct, criminal record, environment, police purpose, and source of information).

Of the factors listed, the conduct of a defendant usually plays a key role in evaluating the propriety of a *Terry* stop since, as with petitioner's flight in the case now before us, such conduct is what frequently focuses an officer's attention on a particular suspect. Accordingly, we now mention the influence which flight has had in other decisions on the question of whether a *Terry* stop is authorized. In *Peters v. New York,* 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968), a companion case to *Terry,* the Supreme Court stated that deliberately furtive actions and flight at the nearing of police are strong indicia of mens rea. *Id.* at 66. While there are a minimal number of cases which hold that flight, without more, authorizes a *Terry* stop, *see, e.g., People v. Waits,* 580 P.2d 391, 393 (Colo. 1978) (en banc) (abrupt evasive maneuver upon confronting police car alone sufficient to raise reasonable suspicion of criminal activity), the vast majority of decisions indicate disagreement. These latter rulings accord great weight to a suspect's flight from police, but require that this conduct be corroborated by other

suspicious circumstances before finding that there were reasonable grounds for the stop. *See, e.g., United States v. Jones,* 619 F.2d 494, 498 (5th Cir. 1980); *United States v. Embry,* 546 F.2d 552 (3d Cir. 1976), · *cert. denied,* 430 U.S. 948 (1977); *United States v. Vasquez,* 534 F.2d 1142 (5th Cir. 1976), *cert. denied,* 429 U.S. 962 (1976); *U.S. ex rel. Richardson v. Rundle,* 461 F.2d 860 (3d Cir. 1972), *cert. denied,* 410 U.S. 911 (1973); *Franklin v. United States, supra; Luker v. State,* 358 So. 2d 504 (Ala. Cr. App. 1978); *Commonwealth v. Battle,* 365 Mass. 472, 313 N.E.2d 554 (1974); *People v. Tebedo,* 81 Mich. App. 535, 265 N.W.2d 406 (1978); *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973); *cf. Braxton v. State,* 234 Md. 1, 197 A.2d 841 (1964) (flight as it pertains to the existence of probable cause to arrest). As we agree with the majority of courts that view the unequivocal flight of a suspect upon seeing police as not alone necessarily indicative of criminal activity, we now examine the record here to determine if there are corroborating circumstances sufficient to create the reasonable suspicion necessary for the stop of petitioner.

Facts of which Officer McEntee had specific knowledge by either police radio or personal perception at the time he attempted to stop the petitioner were: a fellow police officer was pursuing two suspects reported to be armed; the suspects had eluded the foot patrolman just a few moments before Officer McEntee entered the city block in which they had last been seen; upon entering the block the officer heard the petitioner's companion yell "run, police," and observed Watkins run into an alley; and that in response to several calls to halt, the petitioner continued to attempt to evade the officer. We conclude that the totality of these factors, occurring as they did within a minimal time and space stricture, could well create in the mind of a cautious police officer a reasonable suspicion that criminal activity was afoot; consequently the investigatory stop of the petitioner was warranted under the *Terry* decision.[5] We are guided in this

5. By this statement, we in no way intimate that there cannot be other combinations of events perceived by an officer that will authorize a *Terry* stop investigation as being reasonable. The facts of each case will require their own analysis similar to that made here. This is what the Supreme

determination by the complexity of "the rapidly unfolding and often dangerous situations on city streets [where] the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Terry v. Ohio, supra,* 392 U.S. at 10. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). In our view, the situation that confronted Officer McEntee was of the genre specifically addressed by the Supreme Court in *Terry,* necessitating the "swift action" contemplated and approved by that decision. *Accord, Anderson v. State, supra,* 282 Md. at 705-06, 387 A.2d at 284. In the words of the drafters of the Model Code of Pre-Arraignment Procedure:

> [W]here a crime may have been committed and a suspect or important witness is about to disappear, it seems irrational to deprive the officer of the opportunity to "freeze" the situation for a short time, so that he may make inquiry and arrive at a considered judgment about further action to be taken. To deny the police such a power would be to pay a high price in effective policing and in the police's respect for the good sense of the rules that govern them. [ALI, *A Model Code of Pre-Arraignment Procedure* § 110.2, at 272 (Commentary 1975).]

The petitioner argues, nevertheless, that when evidence is challenged on fourth amendment grounds at a suppression hearing, the burden is on the State to establish the sources and reliability of the information upon which the seizing officer acted, including, as in this case, police radio

---

Court envisioned would be done when they said in *Terry:* "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" Terry v. Ohio, *supra,* n. 1, 392 U.S. at 21 (quoting Camara v. Municipal Court, 387 U.S. 523, 536-37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967).

broadcasts. This argument implicitly assumes that the rules governing the reliability of sources of information developed by the Supreme Court under the probable cause requirement of the warrant clause of the fourth amendment apply with the same force and effect to the mere reasonable suspicion standard required to effectuate the less restrictive intrusion of a *Terry* stop.[6] Petitioner's reasoning, however, ignores the fact that in *Terry* itself, the Court was very careful not to base its ruling on the warrant clause contained in the fourth amendment, but on that amendment's more flexible reasonableness clause. *See Terry v. Ohio, supra,* 392 U.S. at 20. Moreover, we believe the Supreme Court, in its subsequent decision of *Adams v. Williams, supra,* has approved a lesser showing of reliability of the sources of information for investigatory stops and protective frisks than is required for arrests, and other types of authorized searches and seizures. In *Adams* a police officer, acting on an informant's tip that a man seated in a nearby car had narcotics in his possession and a gun at his waist, approached the man and grabbed the gun from the suspect. Though there was no showing of the informant's reliability as would seemingly be required by *Spinelli v. United States,* 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), the Supreme Court stated: "Thus, while [our] decisions indicate that this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant, the information carried enough indicia of reliability to justify the officer's forcible stop of Williams." *Adams v. Williams, supra,* 407 U.S. at 147 (citations omitted). Therefore, it would seem that "[r]easonable suspicion 'involves a significantly lower degree of objective evidentiary justification than does probable cause to arrest.'" *State in Interest of H.B.,* 75 N.J. 243, 381 A.2d 759,

---

**6.** Although not clear from his brief, if the petitioner's argument is based on the doctrine established by the Supreme Court in Whiteley v. Warden, 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971), such reliance is misplaced, for *Whiteley* involved a challenge founded on the lack of probable cause to arrest, and not the evidentiary requirements necessary for a stop authorized under *Terry*.

763 (1977) (quoting from *Survey of the 1973 Supreme Court Term,* 27 Rutgers L. Rev. 465, 579 (1974). *See, e.g., United States v. Zapata,* 535 F.2d 358, 359 (7th Cir. 1976) (per curiam); *United States ex rel. Mungo v. LaVallee,* 522 F.2d 211, 214 (2d Cir. 1975), *vacated on other grounds,* 428 U.S. 907 (1976); *United States v. Hernandez,* 486 F.2d 614, 616-17 (7th Cir.) (per curiam), *cert. denied,* 415 U.S. 959 (1973); *Franklin v. State,* 143 Ga. App. 3, 237 S.E.2d 425, 426 (1977), *cert. denied,* 435 U.S. 950 (1978); *State v. Ogata,* 58 Ha. 514, 572 P.2d 1222, 1224 (1977); *State v. Jernigan,* 377 So. 2d 1222, 1224-25 (La. 1979); *State v. Lange,* 255 N.W.2d 59, 62-63 (N.D. 1977). *But see United States v. Robinson,* 536 F.2d 1298, 1299 (9th Cir. 1976); *State v. Benson,* 198 Nebr. 14, 251 N.W.2d 659, 661 (1977) (per curiam).

In our view, in the present case there are at least two factors leading to the conclusion that there existed ample "indicia of reliability" to justify the stop of the petitioner. First, there is the corroboration of the transmission inherent in the location where Watkins was initially observed and his subsequent flight when the police approached. *See United States v. Zapata, supra; Green v. State,* 348 So. 2d 428 (Miss. 1977); *cf. Draper v. United States,* 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959). The second, and more weighty consideration, is manifest from the nature of the broadcast itself; the police transmission did not purport to convey merely a vague suspicion of criminal activity, but significantly reported that a foot patrolman was at that moment in hot pursuit of two armed suspects. The inference to be drawn from these transmissions, that the foot patrolman in pursuit had actual knowledge of criminal activity, could reasonably create in the mind of Officer McEntee a high level of suspicion that a crime had just occurred. Absent an indication that the police have manufactured the broadcast to circumvent the requirements of the fourth amendment, which we do not find in this record, we believe that the composition of this transmission supplies its own "indicia of reliability." It is our view, that for purposes of investigative stops and protective searches, the flexibility inherent in the reasonableness clause of the

fourth amendment requires that no arbitrary rule concerning proof of the basis of informational sources be applied to police communications. The reasonableness of a police officer's actions must necessarily be judged, in part, by the content and nature of the transmission upon which he relies. We are not alone in this conclusion as is demonstrated by the opinion of the New York Court of Appeals in *People v. DeBour,* 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976), where it is stated:

> 'There is a difference of significant degree between a report only that a person has a gun in his possession and another report that a person not only has a gun but that he has just used it for the commission of a crime.' Of course, where the report indicates that the person has used the weapon to menace or threaten or will use the weapon if stopped for questioning ... then the personal and public safety may well mandate a more intensive police intrusion. [*Id.* at 573 (quoting from *People v. Green,* 35 N.Y.2d 193, 360 N.Y.S.2d 243, 318 N.E.2d 464, 465 (1974). See also *People v. Taggert,* 20 N.Y.2d 335, 229 N.E.2d 581, 586 (1967); *State v. Lesnick,* 84 Wash. 2d 940, 530 P.2d 243, 246 (1975) (en banc)).]

Here, we have no doubt that Officer McEntee was entitled to rely on the inference, certainly reasonable under the circumstances, that the foot patrolman had direct knowledge of illegal activity on the part of the two armed suspects that he was attempting to capture. Consequently, we conclude that there existed sufficient indicia of reliability of the broadcast to justify Officer McEntee's reliance on the information obtained from it, and that the police transmission, combined with the sequence of events which took place in his presence when he entered the 2000 block of Barclay Street, created the predicate justification for the stop of the petitioner.

The final argument advanced by petitioner in his attempt to vitiate his conviction is that the use of physical force to

effectuate an investigatory stop is impermissible under the fourth amendment. We believe this contention neither states the prevailing constitutional law nor recognizes the practical reality and requirements of this type of police investigation. To embrace a rule such as that advocated by the petitioner would unnecessarily undermine the vitality of police investigation in the field, recognized and approved as a necessary ingredient of police practice in *Terry.* The petitioner, in light of the teachings of *Terry,* not unsurprisingly anticipates this conclusion and rejoins with a three-point analysis. He points out: 1) the majority of suspects submit to police questioning when approached on the street, 2) the fact that a person refuses to stop may provide the additional inference necessary to obtain probable cause to arrest the suspect, and 3) where probable cause to arrest does not exist, then the police officer "simply has insufficient information to justify an intrusion as serious as a physical seizure." Even if we assume that the vast majority of suspects voluntarily submit to police questioning, *see* Pitcher, *The Law and Practice of Field Interrogation,* 58 J. Crim. L.C. & P.S. 465 (1965), it simply does not follow that the use of force to stop the few who do not submit is constitutionally impermissible. Furthermore, were the rule such that it permitted suspects to ignore a request to stop, we seriously doubt that the exercise of the consequent right to walk away would add much to the probable cause determination. More fundamentally, however, we believe the petitioner misconceives the nature of *Terry* and its progeny because a *Terry* stop is a *forcible* detention — a seizure of the person under the fourth amendment. *Terry v. Ohio, supra,* 392 U.S. at 16-19; *see Adams v. Williams, supra,* 407 U.S. at 146. Although it is not as serious an intrusion into the personal security of the suspect as an arrest, "whenever a police officer *accosts an individual and restrains his freedom to walk away,* he has 'seized' that person." *Terry v. Ohio, supra,* 392 U.S. at 16 (emphasis added). Moreover, the Supreme Court in *Terry* noted the distinction between a seizure of the person and actions of a police officer that do not call into play the fourth

amendment: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, *by means of physical force or show of authority, has in some way restrained the liberty of a citizen* may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16 (emphasis added). The petitioner has cited no court that has adopted the position that physical force is not available for a *Terry* stop, and our own search has revealed none. Indeed, of the courts that have addressed the issue, all have concluded that when the Supreme Court used the term "forcible stop," it meant what it said. *See, e.g., United States v. Thompson,* 558 F.2d 522 (9th Cir. 1977), *cert. denied sub nom., Reeve v. United States,* 435 U.S. 914 (1978); *United States v. Coades,* 549 F.2d 1303 (9th Cir. 1977); *United States v. Purry,* 545 F.2d 217 (D.C. Cir. 1976); *Edwards v. United States,* 364 A.2d 1209 (D.C. 1977); *Comm. v. Dever,* 243 Pa. Super. 87, 364 A.2d 463 (1976). In light of the above, we conclude that the use of reasonable force to effectuate an investigative detention of a suspect is not an impermissible seizure under the fourth amendment to the United States Constitution.

Having determined that there existed specific and articulable facts upon which to found a reasonable suspicion of criminal activity, and that the use of reasonable force to effectuate a valid *Terry* stop is permissible under the fourth amendment, we affirm the conviction and sentence of the petitioner in this case.

> *Judgment of the Court of Special Appeals affirmed.*
> *Costs to be paid by petitioner.*

*Cole, J., dissenting:*

The Court holds today that when a police officer receives a broadcast that a fellow officer has "lost" two armed suspects he was in pursuit of in a certain vicinity and one black man out of thirty to fifty blacks in that vicinity runs when his companion says "run, police," the stopping officer is justified in harboring a "high level of suspicion that a crime

had just occurred," and can forcibly stop the runner. This holding I believe is in direct conflict with the protection afforded by the fourth amendment which guarantees all citizens freedom from unreasonable governmental interference with their personal security. I, therefore, respectfully dissent.

It is clear to me from an examination of the record of Officer McEntee's (the stopping officer) testimony, that he had no idea for whom he was looking [1] nor did he know what, if any, crime had been or was about to be committed. He had no information as to how the suspects were armed, whether with guns, knives, baseball bats, sticks or stones. He did not know whether the suspects were both black, white, Indian, Mexican, Chinese or a combination of such groupings; nor whether the suspects were juveniles, teenagers or adults; nor whether they were both male or both female or one of each; nor whether they were short, tall, thin, fat, or medium in build; nor if the suspects were clothed in tuxedoes or jogging suits. He had absolutely no description.

Nevertheless, because the defendant ran, in ghetto-like Pavlovian response to the command "run, police," this Court holds that Officer McEntee had reasonable suspicion to pursue, apprehend and ultimately search the defendant though an initial "pat down" had indicated that he was unarmed.

The majority seems to take a rather myopic view of the facts. It cites as fact that "the suspects had eluded the foot patrolman [2] just a few moments before Officer McEntee

---

1. On direct examination Officer McEntee repeatedly admitted that the broadcasting officer gave him no description whatsoever of the suspects. On cross-examination when asked about the people who were in the street when he arrived in the area he responded

Q   Were there two black males, is that what came over the radio?

A   There were two black males, because he was running.

2. The majority indicates that the unidentified police officer was a foot patrolman but nothing in the testimony of Officer McEntee substantiates this or indicates that he knew by what mode of travel the suspects were being pursued. The majority apparently relies on the statement of the State's Attorney when presenting the agreed statement of facts.

entered the city block in which they had last been seen." However, Officer McEntee testified that "[A]s I was driving north in the 2000 block of Barclay St., the officer in pursuit said he lost the suspects in the area of 21st and Barclay. At this time, I slowed my vehicle down and began to observe other people on the street and in the houses and in the alleys . . . ." Thus, Officer McEntee was *in* the block when the other officer lost sight of the suspects; he could see to 21st and Barclay St. There was no time lapse as the majority suggests. This is significant because it gives the defendant no time in which to go from the act of running to elude the pursuing officer to the act of calmly standing with a friend exhibiting no physical exertion (such as sweating or breathing hard) when Officer McEntee saw him in what Officer McEntee described as appearing in no unusual manner.

In *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the Supreme Court approved a lesser standard than probable cause to justify a stop of a citizen by a police officer. However, the Supreme Court made it clear that

> In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. [392 U.S. at 21.]

In *Terry,* the officer of 30 years experience had observed the suspects over a considerable period of time. He followed them and attempted to interview them before he physically seized them. Their actions indicated to him that they were about to commit a hold-up, thus making the suspects a danger to the community. The officer had a well-founded concern for his safety in conducting the stop, *viz.,* the officer could "point to specific and articulable facts" justifying the intrusion.

When we contrast those facts with the case *sub judice,* we find Officer McEntee's decision is supported only by the radio broadcast and the defendant's running. Certainly this

Court should require the State to produce at the suppression hearing evidence giving rise to reasonable suspicion.

The majority in footnote 6 suggests that Watkins' reliance on *Whiteley v. Warden,* 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971), is misplaced because *Whiteley* dealt with probable cause rather than reasonable suspicion to justify police action. However, there is no basic difference between the two concepts that dictates a different result in the case of a stop based on a radio broadcast.

In *Whiteley, acting on a tip,* the sheriff signed a complaint charging the defendant and another person with breaking and entering a business establishment. The complaint was made before a justice of the peace and a warrant was issued. The sheriff put out a statewide broadcast to pick up the two persons named in the complaint. The radio transmission was picked up by the Albany County Sheriff's office and communicated to the Laramie Police Department. The message contained names and descriptions of the two suspects, the type of car probably being driven, and the amount of money taken. On the date of the broadcast, a Laramie policeman arrested the defendant and his companion in reliance on the information in the radio broadcast. The Supreme Court held that the sheriff did not have probable cause to arrest and, therefore, he could not delegate this function to another officer. Thus, the arrest was illegal. The language of the Court is significant.

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime. Therefore, petitioner's arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial. *Mapp v. Ohio,* 367 U.S. 643 (1961). [*Whiteley v. Warden, supra,* 401 U.S. at 568.]

The principle announced in *Whiteley* was applied to a *Terry* case in *United States v. Robinson,* 536 F.2d 1298 (9th Cir. 1976). There an officer received a radio message to be on the lookout for a possible stolen 1976 Oldsmobile Cutlass, Nevada license plate CKC 434. Based solely on that message, the officer saw the described vehicle, stopped and searched it. The United States Court of Appeals (9th Cir.) in reversing the District Court said:

The fact that an officer does not have to have personal knowledge of the evidence supplying good cause for a stop before he can obey a direction to detain a person or a vehicle does not mean that the Government need not produce evidence at trial showing good cause to legitimate the detention when the legality of the stop is challenged.

＊　＊　＊

The Government's argument that effective law enforcement requires us to validate stops made in response to calls from fellow law enforcement officers, without any proof at trial that a factual foundation existed to support the call, was made and firmly rejected by *Whiteley v. Warden* [citations omitted]. *Whiteley* involved probable cause, rather than founded suspicion, but we perceive no substantive difference between the two doctrines that would warrant a different result. [*Id.* at 1300.]

*See Franklin v. State,* 143 Ga. App. 3, 237 S.E.2d 425 (1977); *Price v. State,* 37 Md. App. 248, 376 A.2d 1158 (1977); *State v. Benson,* 198 Neb. 14, 251 N.W.2d 659 (1977); *State v. Lange,* 255 N.W.2d 59 (N.D. 1977).

The majority cites *Anderson v. State,* 282 Md. 701, 387 A.2d 281 (1978), as support for its position. In *Anderson* the officer suspected the defendant of a particular crime, robbery. The defendant, who was in company with another man, matched a vague description of the suspects being sought. He was in an area the suspect was reported to frequent and his behavior, walking away and looking over his shoulder at the police, was suspicious. We found that there were not sufficient articulable facts to constitute reasonable suspicion. Officer McEntee's pursuit of a man without knowing whether or not a crime had been committed and without having any description upon which to base a rational judgment hardly conforms to either *Terry*[3] or *Anderson.*

The majority suggests that *United States v. Wright,* 565 F.2d 486 (8th Cir. 1977), in which it was determined that a *Terry* stop was valid, is factually akin to the present case, in that the court relied on a report of a recent robbery, the suspect's proximity to the reported crime, and the defendant's suspicious conduct upon awareness of the police officer's presence. However, the majority does not mention that the radio report contained the following information noted by the court.

> As of the moment of the actual investigatory stop, the following "articulable facts" were available to the officers: at approximately 10:00 p.m., a radio dispatch had informed them, while on routine auto

---

**3.** Cases that have applied *Terry* to investigative seizures have followed a similar vein. In United States v. Brignoni-Ponce, 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975), where the Court considered the illegal flow of aliens into the United States to be a very significant governmental interest, the Court still found this fact insufficient to justify the stopping near the border of a vehicle occupied by people of Spanish descent.

The Court held that even though the car stop was a minor intrusion, personal freedom was more significant. *See also* Delaware v. Prouse, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979); Dunaway v. New York, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); Brown v. Texas, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979).

patrol, that a nearby gas station had just been robbed by two adult black males, one 5'11" and the other a little taller, possessing a long-barreled handgun; they were last seen running in an easterly direction from the gas station; an estimated six to eight minutes later, the officers observed Wright and Bell, both black, standing about 150 feet away from the patrol car in a parking area located in a racially mixed part of the city within eight blocks of the gas station; although the area was well-lighted, the officers could not tell whether one of them was taller than the other; although it was a warm evening, one of them was wearing a long leather jacket; Wright and Bell looked at the police car, faced each other as if conferring, then entered a Lincoln Continental parked nearby at the curb; as the officers approached in their car, the Lincoln Continental pulled away from the curb, stopped, backed up to the curb, stopped, pulled forward again, and proceeded down the road before being cut off and stopped by the police car; such forward-backward driving activity was not necessary to move from the curb into the road.

Applying the standard prescribed in *Terry, supra,* we hold that such facts, considered as a whole, warranted Hofmann and Erbes, as reasonable and cautious police officers guided by their training and experience, in making the investigatory stop. [*Id.* at 489].

In *United States v. Collins,* 532 F.2d 79 (8th Cir. 1976), the initial stop of a white over gold 1969 Cadillac being driven by a black male three miles and a few minutes from the scene of a bank robbery was held to be permissible where the arresting officer had received a radio report informing him that a particular bank had just been robbed and that the suspects were three Negro males who left in a light brown, late model Cadillac.

The Oregon Court of Appeals, in *State v. Hall,* 32 Or. App. 133, 573 P.2d 332 (1978) held that a radio report of a bank robbery committed a few minutes earlier by a white male, approximately 20 years of age, having brown shoulder length hair, a full beard, standing between 5'9" and 5'10", weighing 170 pounds and wearing a red jacket and Levi's gave a receiving officer reasonable suspicion to stop a white male, 5'9" with dark shoulder length hair and a full beard, wearing Levi's and a *gray* jacket. The person who was stopped weighed 50 pounds more than the suspected person, and was wearing a different colored jacket, but the particularities were considered insignificant in light of all the other consistencies. If the Court here were to disregard any of the information that was available in this case, there surely would not even *be* a case in the first instance.

If as the Supreme Court said in *Terry* reasonableness is the standard by which we balance the public interest against the citizen's right to personal security free from police intrusion, then in this case the actions of Officer McEntee were totally unreasonable. In *Terry* the public interest was the prevention of a crime of violence — a hold-up — and the officer was able to articulate specific facts that afforded him the right to make a considered judgment. In the instant case, the facts are all non-specific. Not only does Officer McEntee not know of a crime but he has no basis in fact to single out any one person as opposed to another as the perpetrator of a crime. The Court, in effect, says defendant's flight is enough. Well, suppose four had run or the entire crowd had dispersed in flight? Whom would he choose to stop and on what basis? The majority does violence to the principle that there must be "a reasonable suspicion that someone is about to commit or has just committed a crime." In this case there is absolutely no evidence of criminal activity. The Court's decision today has the potential for becoming a true chimera, especially in the economically depressed areas of the State where police-community relations are, to say the least, strained. The Court gives license to the police to stop any individual who runs when the police happen upon the scene. To justify the stop, the police need only explain that some

618

unidentified fellow officer broadcast that he had lost pursuit of two suspicious-looking characters. In holding that such meager information rises to the level of being articulable facts (as required in *Terry*) sufficient to reasonably warrant police intrusion, the majority demonstrates a profound lack of understanding of the realities of ghetto life. The majority places its imprimatur on a course of police conduct which is bound to interfere with the liberty of law-abiding citizens who choose to avoid unwarranted confrontations with police.

Judges Eldridge and Davidson have authorized me to state that they join in this opinion.