568 A.2d 48

**STATE of Maryland**

v.

**Gregory C. LEMMON.**

**No. 61, Sept. Term, 1989.**

Court of Appeals of Maryland.

Jan. 19, 1990.

366

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

José Felipé Anderson, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for respondent.

Argued Before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland (retired), Specially Assigned, JJ.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

The right of the People to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . .

Article IV, Constitution of the United States. Gregory C. Lemmon claims that the judgment against him in a criminal cause was come by in violation of this right. The journey of the claim to this Court began when the State's Attorney for the City of Baltimore informed the Circuit Court for Baltimore City that Lemmon had committed certain violations of the controlled dangerous substances laws. In contest to the charges, Lemmon alleged that articles of evidence taken from him by police authorities were obtained as the result of an illegal search and seizure in violation of his constitutional rights. He prayed the court to suppress all evidence so obtained. After a plenary hearing, the court denied the motion. Lemmon pleaded not guilty. Trial proceeded on an agreed statement of facts and the receipt in evidence of the challenged contraband. The court found him guilty of unlawfully possessing a controlled dangerous substance, diazepam (valium), with the intent to distribute and sentenced him to imprisonment in the Baltimore City

Jail for a period of 30 days.[1] Lemmon noted an appeal to the Court of Special Appeals. That court reversed the judgment. *Lemmon v. State,* No. 1070, September Term, 1988, filed 21 March 1989 (unreported). The State sought review by this Court. It filed a petition for the issuance of a writ of certiorari which presented two questions:

1) In light of *Brower v. Inyo County,* 489 U.S. ——, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), did the Court of Special Appeals err in ruling that Lemmon was "seized" for purposes of the Fourth Amendment when he was chased by police officers?

2) In light of *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), did the Court of Special Appeals err in concluding that the "seizure" of Lemmon was not supported by sufficient articulable suspicion?

We granted the State's petition and ordered the issuance of the writ. Inasmuch as we conclude that the answer to each question is no, we affirm the judgment of the Court of Special Appeals.

The questions presented to us arose in the framework of testimonial evidence elicited at the hearing on the motion to suppress. Three Baltimore City policemen testified on behalf of the State: Officer Darryl Kane, assigned to the Southern District Drug Enforcement Unit; Police Agent Steven Atkinson, assigned to the Drug Enforcement Unit; and Officer Bernard White, assigned to the Southern District Drug Enforcement Unit. The parties stipulated that each officer was an expert in the field of drug enforcement laws. We set out a precis of their testimony as it related to the information which triggered the activities of the police,

---

1. The court prescribed that
   sentence shall commence on the earlier of these three occasions:
   Number one, the defendant's appeal is dismissed at any time.
   Number two, that a writ of certiorari to the Court of Appeals is denied by the Court of Appeals, or
   Number three, that a mandate is issued by the Court of Appeals.

the pursuit of Lemmon, his apprehension, and the recovery of the contraband.

At the time of the incident, the officers were on duty, dressed in plain clothes, and riding in an unmarked police car. Atkinson was driving. Kane occupied the front passenger seat of the car and White the rear seat. Each had a radio, tuned to the police band, and was armed with a revolver carried in a holster. A call came over the radios. Heard simultaneously by each officer, the call announced that there was a narcotics violation occurring in the 2400 block of Kermit Court in Baltimore City. The dispatcher did not give the source of the information, stating only that he did not know the source. Kane agreed with the trial court's characterization:

> [A]ll you had was a tip and that tip was basically that something was occurring. You didn't know who, you didn't know how, you just knew that some narcotics transaction was going on in that block.

White "believed" that the call specified that there was "a black male in the area selling narcotics" but the dispatcher furnished no other details.

The officers responded to the call. As they approached the 2400 block of Kermit Court, Kane and White left the car and walked toward the designated area. They saw a "black male," who proved to be Lemmon, talking to another "black male" who proved to be one William Meekins. Kane said that there was no one else in the area. White recalled that there were other "black individuals" in the area when the officers arrived on the scene. He did not know exactly how many. There were more than two but he could not say whether there were as many as eight or ten.

When the two officers were about 25 feet from the men, Kane in front, Lemmon looked in their direction and started to walk away. Kane identified himself as a police officer and said: "Come here." Lemmon "took off running." Meekins stayed put. Lemmon fled down the 2600 block of Maisel Street with Kane pursuing and White in the rear.

Atkinson, in the police car, observed that Lemmon was outdistancing Kane and White. He drove the car in front of Lemmon to cut him off, but Lemmon avoided the blockade by running around the vehicle. Atkinson joined the chase on foot and was now leading the pursuit. Lemmon ran to the rear of the houses facing the 2600 block of Maisel Street. Atkinson saw him reach into his jacket pocket, pull out a "medicine type vial," and try to force it through a chain link fence. The vial bounced off the fence and fell to the ground.

When Kane saw Lemmon dart between a break in the houses toward the rear of the 2600 block of Maisel Street, he anticipated that Lemmon would return to the front of the street, so he ran along Maisel Street to intercept Lemmon. Lemmon appeared as Kane had hoped, with Atkinson close behind. The officers stopped Lemmon. In the meantime a uniformed policeman had arrived on the scene. The officers "ordered [Lemmon] to the ground," and that's where he stayed with the uniformed officer guarding him on orders from Atkinson to "detain" him while Atkinson and Kane went to recover the vial. The officers found the vial where Atkinson had seen Lemmon discard it. There were no other items in the vicinity of the vial and no one else around. Less than a minute elapsed from the time Lemmon was stopped until the vial was recovered. The vial bore no label. It contained 44 pills which Atkinson recognized as valium. Kane said that while he was pursuing Lemmon, he "heard something like pills or something shaking in Lemmon's pocket. I could hear it shaking the whole time I was running."

According to Kane, Lemmon was not "arrested" until he and Atkinson returned from recovering the vial. Kane observed: "Prior to that he was not under arrest." Lemmon was being pursued because "[w]e wanted to find out why he was running." Atkinson explained why he had joined the chase when he saw Kane pursuing Lemmon:

Based upon knowledge of Kane and my reason for being there, I felt a person who was running had some reason to be running from the police.

None of the officers had at any time displayed a weapon. Meekins, who had remained at the scene when the officers approached, was not arrested.

The testimony of Meekins, called by the defense, was in sharp conflict to that of the prosecution witnesses as to the initial approach of the police.

I noticed a plain car on the grass at the corner of Kermit Court and the officer, the plain clothes officer, got out of the car and was searching guys at that corner.

He knew they were officers "because they had handcuffs in their back and I know them by face." Meekins told Lemmon: "I wasn't walking towards them, let's turn around."

The next thing I know, two officers were running towards us and they had their guns out. They never identified themselves.

One of the officers said: "If you run, I'm going to shoot." Meekins stood still but Lemmon ran. One officer went in pursuit and the other, identified as White, held Meekins.

The trial judge, exercising his function of judging the credibility of witnesses, *Corbin v. State,* 237 Md. 486, 490, 206 A.2d 809 (1965), accepted the testimony elicited by the State. He found "no material flaw in the testimony of the officers because of [the] discrepancies." He saw "no defect in [the officers'] credibility." Meekins, however, "did not impress [the judge] as that credible of a witness." In the light of the testimony which the judge found to be credible, he concluded that a seizure of Lemmon in the constitutional sense had not occurred at the time the contraband was discarded. In other words, according to the judge, the pursuit prior to the abandonment of the contraband "had no Fourth Amendment significance." It was the abandonment that

gave the police a reasonable suspicion to take the action they took which was the temporary detainment of the

defendant and at that time they had probable cause to arrest him.

Therefore, the judge denied the motion to suppress.

The Court of Special Appeals saw it differently. It concluded that a Fourth Amendment seizure of Lemmon took place when the police ordered Lemmon to "come here," whereupon he fled with them in pursuit. Thus, the attempt to stuff the vial through the fence was subsequent to the seizure. *Lemmon v. State, supra,* slip opinion at 7. Both the trial court and the intermediate appellate court looked to *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), in arriving at their disparate conclusions. The trial court considered *Chesternut* "in conjunction with" *Watkins v. State,* 288 Md. 597, 420 A.2d 270 (1980), which did not have the benefit of the Supreme Court opinion when it was decided. The Court of Special Appeals followed *Chesternut* in the light of its application of the teachings of that opinion in *Hawkins v. State,* 77 Md.App. 338, 550 A.2d 416 (1988). We also turn to *Chesternut* to determine the matter of the seizure of Lemmon.

■ *Chesternut* declares that the test to be applied in determining whether a person has been "seized" within the meaning of the Fourth Amendment is whether in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. 108 S.Ct. at 1979.

In embracing this test, the Supreme Court declined to rule, as the petitioner would have it,

that a lack of objective and particularized suspicion would not poison police conduct, no matter how coercive, as long as the police did not succeed in actually apprehending the individual.

*Id.* at 1979. Nor would it adopt respondent's contention. Respondent contends, in sharp contrast, that any and all police "chases" are Fourth Amendment seizures. Respondent would have us rule that the police may never pursue an individual absent a particularized and objective

basis for suspecting that he is engaged in criminal activity.

*Id.* The Court indicated that no bright-line rule applicable to all investigatory pursuits can be fashioned.

Rather than adopting either rule proposed by the parties and determining that an investigatory pursuit is or is not *necessarily* a seizure under the Fourth Amendment, we adhere to our traditional contextual approach.

*Id.* (emphasis in original). The Court observed:

The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

*Id.* The Court warned:

While the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police. The test's objective standard—looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment.... This "reasonable person" standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.

*Id.* at 1979–1980 (citation omitted).

■ Applying the test to the facts adduced from the testimony which the trial judge found to be credible, *see* Md.Rule 8–131(c), we conclude that Lemmon was seized by the police before he discarded the vial containing the controlled substance. In view of all of the circumstances

surrounding the incident prior to Lemmon's abandonment of the contraband, there is no doubt that a reasonable person would have believed that he was not free to leave. The approach by two officers, the command to "Come Here," the immediate pursuit by the officers when Lemmon ran, the attempt to set up a blockade with the police car when it was apparent that Lemmon was getting away, the joinder of the third officer in the posse, leaving the police car unattended, the attempt by one of the pursuers to circumvent a possible line of flight—all of these measures were amply sufficient to communicate to the reasonable person an attempt to capture or otherwise intrude upon freedom of movement. The aggressive actions of the police would cause the reasonable person to believe that the police objective in the· pursuit was to restrain his liberty, not merely to be afforded the opportunity to talk to him. We find it clear that the conduct of the police was so intimidating in the circumstances that Lemmon could reasonably have believed that he was not free to disregard the police presence and go about his business. We hold that Lemmon was "seized" within the meaning of the Fourth Amendment before he discarded the contraband, and the Court of Special Appeals did not err in so determining.

The State's petition for a writ of certiorari called on us to consider the matter of the seizure of Lemmon in light of *Brower v. County of Inyo,* 489 U.S. ——, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). *See* Question 1 set out *supra.* The State is of the notion that *Brower* "refined" *Chesternut* by flatly holding that "no seizure takes place until the restraining effect of a police command actually occurs, *i.e.,* when the person is within the police officer's physical control." We do not read *Brower* that way. Although *Brower* was decided in the factual posture of a roadblock set up by the police which resulted in the death of the fleeing Brower when his car struck it, we do not interpret the opinion as requiring that the pursued be actually stopped to constitute a seizure. The Court said:

[A] roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a

stop by physical impact if voluntary compliance does not occur.

109 S.Ct. at 1382. Justice Stevens, with whom Justice Brennan, Justice Marshall, and Justice Blackmun joined, observed in his opinion concurring in the judgment:

The Court is unquestionably correct in concluding that respondent's use of a roadblock to stop Brower's car constituted a seizure within the meaning of the Fourth Amendment.

*Id.* at 1383. The Court noted that whenever an officer restrains the freedom of a person to walk away, he has seized that person. *Id.* at 1380. In the light of the opinion as a whole, we do not construe this to mean there must be an actual taking of the person; there may be a *constructive* restraint of the freedom to walk away. A significant part of the Court's opinion was with respect to the *intentional* acquisition of physical control as a characteristic of a seizure, as distinguished from *accidental* or *unintentional* control. *Id.* at 1381. Any implication that *actual* physical control is required must be read in the frame of reference of the Court's concern with that characteristic. We do not see in the Court's declaration, even if not dicta, that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control," *id.,* that there must be an actual laying on of hands and a taking of the person. The declaration goes no further than the notion that a governmental termination of freedom of movement must be through means intentionally applied. *Id.* In short, we believe that *Brower* is in no way inconsistent with *Chesternut* and leaves the *Chesternut* test intact in all material aspects.

Given that Lemmon was seized within the meaning of the Fourth Amendment, we address the question whether the seizure was "unreasonable" as proscribed by the Amendment. The Court of Special Appeals relied on *Watkins v. State, supra,* in determining that the seizure did not meet constitutional dictates. In *Watkins* we examined "the principles established by the Supreme Court of the United

States in the landmark case of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which articulates the bedrock constitutional law" pertaining to search and seizure. 288 Md. at 600–601, 420 A.2d 270. We quoted from *Anderson v. State*, 282 Md. 701, 704, 387 A.2d 281 (1978) (citations omitted), in which we summarized the applicable law announced by the Supreme Court in *Terry:*

> The Court observed [in *Terry* ] that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" [within the meaning of the Fourth Amendment].

We said in *Anderson* at 704–705, 387 A.2d 281 (citations omitted):

> The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." In determining whether the intrusion was justified at its inception, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." The reasonableness of an intrusion is to be assessed against an objective standard—whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate."

We observed in *Watkins* [288 Md.] at 602, 420 A.2d 270, that *Anderson* [282 Md.] at 706, 387 A.2d 281, declared that "the real thrust of *Terry* is directed at instances in which there is a reasonable suspicion that someone is about to commit or has just committed a crime." We noted that

> [n]either the *Terry* opinion, nor the Supreme Court decisions since that case, spell out with any precision the factors to be analyzed in determining whether the police officer had knowledge of specific and articulable facts justificatory of the detention of an individual on less than probable cause.

*Watkins*, 288 Md. at 602, 420 A.2d 270. But we indicated that when federal and state courts applied *Terry* to resolve

whether a police officer had the requisite reasonable suspicion, the criteria they looked to were "appearance, conduct, criminal record, environment, police purpose, and source of information." *Watkins* at 603, 420 A.2d 270. *See Anderson*, 282 Md. 707 n. 5, 387 A.2d 281. We suggested that "the conduct of a defendant usually plays a key role in evaluating the propriety of a *Terry* stop. . . ." *Watkins* [288 Md.] at 603, 420 A.2d 270. That led us to a discussion of flight. We expressed agreement with the majority of courts that "view the unequivocal flight of a suspect upon seeing police as not alone necessarily indicative of criminal activity. . . ." *Watkins* at 604, 420 A.2d 270. It thus becomes necessary to examine the record in the particular case "to determine if there are corroborating circumstances sufficient to create the reasonable suspicion necessary for the stop of [the suspect]." *Id.* But, we pointed out, reasonable suspicion involves a significantly lower degree of objective evidentiary justification than does probable cause to arrest. *Id.* at 606–607, 420 A.2d 270.

The State's petition for a writ of certiorari called on us to consider the matter of the reasonableness of the seizure of Lemmon in light of *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). *See* question 2 set out *supra*. In *Sokolow*, the Court began its consideration of whether enforcement officers had lawfully made an investigative stop of a person who was suspected of being a drug courier by setting out its holding in *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884,

> that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause.

*Sokolow*, 109 S.Ct. at 1585. The Court warned:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch'." The Fourth Amendment requires "some minimal level of objective justification" for making the

stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause.

*Id.* (citations omitted). The Court recognized that "[t]he concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' " *Id.* (citations omitted). Nevertheless, it characterized "reasonable suspicion" as "one of the relatively simple concepts embodied in the Fourth Amendment." *Id.* The Court continued:

In evaluating the validity of a stop such as this, we must consider "the totality of the circumstances—the whole picture." *United States v. Cortez,* 449 U.S. 411, 417 [101 S.Ct. 690, 695, 66 L.Ed.2d 621] (1981). As we said in *Cortez:*

"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers." *Id.* at 418 [101 S.Ct. at 695].

*Id.* The Court rejected the suggestion that enforcement authorities are obligated to use the least intrusive means available to verify or dispel their suspicions that the law was being violated.

The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift on-the-spot decisions ... and it would require courts to "indulge in 'unrealistic second-guessing.' "

*Id.* at 1587 (citations omitted).

We are not in accord with the State's notion that *Sokolow* "provides new guidelines regarding when *Terry* stops are

justified." *Sokolow,* as we see it, affirmed the teachings of *Terry* and in no way compels a result different from that which would be reached under those teachings. We believe that *Sokolow* is consistent with our discussion and application of *Terry* in *Anderson* and in accord with our examination of the principles of *Terry* which we made in *Watkins.*

■ We approach the determination whether the seizure of Lemmon was constitutionally reasonable by giving due consideration to the tenet that we must look to the totality of the circumstances—the whole picture. We do so in light of the facts and circumstances found to be credible by the trial judge. We are mindful that we are dealing with probabilities, not certainties. In our consideration of the totalities of the circumstances, we factor in the variables of the information leading to police action, the environment, the police purpose, and the suspect's conduct. Here, the immediate source of the information to the apprehending officers was a police dispatcher. The dispatcher's source of the information, according to him, was unknown; it was an anonymous tip. The actual information received by the dispatcher and transmitted to the three officers was no more than that there was a narcotics violation occurring in the 2400 block of Kermit Court. As the trial court characterized it to the officers, *see supra,* all they had

> was a tip and that tip was basically that something was occurring. You didn't know who, you didn't know how, you just knew that some narcotics transactions was going on in that block.

We said in *Lee v. State,* 311 Md. 642, 653, 537 A.2d 235 (1988): "Critical to any constitutional validity of the warrantless seizures of [the person of an individual] is the reliability of the information from the informant." Here, the informant was not even known. Nor do we believe that the anonymous informant's reliability could be determined under the totality of the circumstances in this case. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Lee* [311 Md.] at 653–654, 537 A.2d 235. The officers saw two men talking. This was not enough to

establish that a narcotics transaction was taking place. This remains so, even though Lemmon fled and the trial court accepted the statement by Kane that during the "whole time he was running after Lemmon," he could hear "something like pills or something shaking in Lemmon's pocket." As for the environment, the record does not disclose that the area around the 2400 block of Kermit Court was notorious for drug transactions. With respect to the police purpose, that the police merely desired to talk to Lemmon to find out why he was running, was belied by their actions. As we have seen, although the conduct of a suspect usually plays a key role in evaluating the reasonableness of a seizure of the person, it is clear that the unequivocal flight of a suspect upon seeing police is not necessarily indicative of criminal activity. It is not improbable that Lemmon could have had a reason short of criminal activity for not wanting to confront the police.

The short of it is that the reasonableness in all the circumstances of the invasion of Lemmon's personal security was not shown. The police were not able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion. When we assess the reasonableness of the intrusion against the objective standard—whether the facts available to the officer at the moment of seizure would warrant a man of reasonable caution in the belief that the action taken was appropriate, we find that the facts were wanting. Therefore, the seizure of Lemmon offended his Fourth Amendment right to be secure in his person.

The contraband was not rendered admissible by Lemmon's abandonment of it. Both the trial court and the intermediate appellate court recognized that a person may relinquish the Fourth Amendment right by voluntarily abandoning it. *Duncan and Smith v. State*, 281 Md. 247, 261–262, 378 A.2d 1108 (1977). And both were aware of the limitations on the doctrine—it does not apply when the abandonment was the result of unlawful police action. *Duncan and Smith* at 263, 378 A.2d 1108. When the

abandonment is forced by illegal police conduct, it is not voluntary and its seizure offends the constitutional dictate. *Beale v. State*, 230 Md. 182, 186–187, 186 A.2d 213 (1962). The trial court, on its determination that the contraband was discarded before Lemmon was seized, concluded that the abandonment was voluntary. The Court of Special Appeals, on its determination that the contraband was discarded after Lemmon was seized, concluded that the abandonment was involuntary. Inasmuch as the conclusion of the Court of Special Appeals was in accord with our determination, *supra*, that the abandonment was subsequent to the seizure, its conclusion was correct. Since the abandonment was involuntary, as forced by illegal police conduct, the obtaining of it by the police offended the Fourth Amendment. The motion to suppress it should have been granted.

We hold that the Court of Special Appeals did not err in reversing the judgment entered against Lemmon.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED;

COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.

McAULIFFE, Judge, dissenting.

I cannot be certain whether the majority finds the seizure of Lemmon to have occurred when Officer Kane identified himself as a police officer and said "come here," or later when a third police officer joined the chase and a police cruiser was used in an unsuccessful attempt to block Lemmon's progress. In either event, I disagree with the result reached by the majority.

Assuming, without conceding, that the officers lacked "reasonable suspicion" to stop Lemmon when they first approached and spoke to him, I do not agree that they "seized" him within the meaning of the Fourth Amendment when, from a distance of 25 feet, Officer Kane identified himself as a police officer and said "come here," and the

defendant ran away. The police may have intended to seize Lemmon at that point, and if he had submitted to their authority by stopping, a seizure would have been effected. Lemmon did not submit, and the police were wholly unsuccessful in their attempt to stop him at that point. These facts disclose an attempted seizure, not a seizure.

Neither of the police officers had their guns drawn as they approached the two men, nor when Officer Kane said "come here" after Lemmon turned and began to walk away. As the Supreme Court made clear in *Brower v. County of Inyo*, 489 U.S. ——, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), a police command to stop, effectively communicated to a defendant, does not ordinarily constitute a seizure when the defendant refuses to submit and instead takes flight. As the Court pointed out, "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Id.*, 489 U.S. at ——, 109 S.Ct. at 1381.

In *Brower*, the Supreme Court approved the holding of the United States Court of Appeals for the Sixth Circuit in *Galas v. McKee*, 801 F.2d 200 (6th Cir.1986). In *Galas*, a motorcycle officer, by means of emergency lights and siren, signaled the operator of an Oldsmobile to pull over and stop. The motorist, rather than stopping, accelerated, and a high speed chase ensued, ending when the driver of the Oldsmobile lost control and crashed. In holding that these circumstances did not amount to a seizure, the Court of Appeals said:

> Clearly, during the initial stages of the pursuit when the minor plaintiff decided to flee rather than to obey the defendant officer's directive to stop, the minor plaintiff was not restrained. Just as clearly, when the pursuit terminated in an accident with personal injury to the minor plaintiff, he was not restrained by, or as a result of, the officer's show of authority. Rather, the minor plaintiff's inability to leave was because he wrecked his automobile, and no seizure occurred.

*Id.* at 203. The Supreme Court, speaking of an analogous hypothetical situation, said "[w]e agree that no unconstitu-

tional seizure occurs there." *Brower, supra*, 489 U.S. at ——, 109 S.Ct. at 1381. The Supreme Court explained: The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means—his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and side-swiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

It is difficult to reconcile the language of *Brower* with that of *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), upon which the majority relies. I would resolve the conflict by accepting the latest word of the Supreme Court on the matter.

Nor do I believe that a seizure was later effected when Officer Atkinson drove his vehicle into the path of the fleeing Lemmon, who simply ran around it.[1] Lemmon was seized only when Officer Atkinson, who had by this time joined the foot race, anticipated Lemmon's probable route and intercepted him. At that point, Lemmon was seized. But the seizure did not produce the contraband—that had been abandoned by Lemmon during the chase and before the seizure.

I would reverse the judgment of the Court of Special Appeals, and direct that the judgment of the trial court be affirmed.

---

1. If a seizure did occur at that point, there may well have been reasonable suspicion to justify it. Lemmon's flight added a new and significant factor to the information already possessed by the police.