957 A.2d 150

**STATE of Maryland**

v.

**James William DICK.**

**No. 2651, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 12, 2008.

694

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on brief), Baltimore, for appellant.

David P. Kennedy (Nancy S. Forster, Public Defender, on brief), Baltimore, for appellee.

Panel: DAVIS, ZARNOCH, LAWRENCE F. RODOWSKY, (Ret., Specially Assigned) JJ.

ZARNOCH, J.

The State appeals the decision of the Circuit Court for Baltimore County granting appellee's Motion to Suppress evidence seized in connection with his arrest on charges of possession of cocaine with intent to distribute and related charges. The decision below turned on whether appellee had been "seized" in violation of the Fourth Amendment to the United States Constitution and whether he was "free to leave" the scene of his initial confrontation with police. However, we believe the issues are best framed as: (1) whether reasonable suspicion existed to initiate an investigative stop of the appellee; (2) whether the police intrusion retained the status of an investigative stop, rather than being transformed into an arrest requiring the showing of probable cause; and (3) whether probable cause existed when appellee was arrested to justify the seizure of evidence from appellee's person. We answer all three questions in the affirmative and reverse the interlocutory decision of the circuit court and remand the case for trial.

I.

On the evening of May 10, 2006, members of the Community Drug and Violence Interdiction Team of the Baltimore County Police were conducting surveillance in a residential area of Wise Avenue and Church Road near a BP gas station.

Previously, the police had received complaints from patrons of the gas station and nearby residents reporting incidents of drug activity on the premises. Detective Timothy Ward and another member of the team had made arrests at the location.

At approximately 7:30 p.m., when it was still daylight, Detective Ward observed Brian Hoffman on a bicycle pedaling around making circles in the parking lot of the gas station. The detective watched him for 10 or 15 minutes as Hoffman continued to pedal circles through the lot. Ward later testified that Hoffman "kept looking up Wise Avenue as if he was waiting for someone to show up." [1] Hoffman then left the lot and pedaled up Wise Avenue where he made contact with appellee, James William Dick, who was on foot. They engaged in a quick conversation, turned, and both went toward the gas station. While Hoffman waited outside on his bike, Dick entered the gas station's convenience store and then exited the store a few minutes later. [2]

At this time, Ward radioed his sergeant that he and Detective Jason Stricklin were going to initiate surveillance on the two men and the officers "took up various locations to have all angles of the gas station covered." Both men left the parking lot and walked down Church Road and out of the view of these officers. However, two other members of the team, Detectives Christopher Mazan and Ryan Massey, joined in the surveillance and, according to Ward's testimony, "had a good eye on the two subjects." Detective Mazan then radioed that Dick and Hoffman had stopped on the side of the roadway near the curb and "they observed the white male on foot hand something to the white male on the bicycle, and the white male on the bicycle handed something to the white male on foot, and the white male on the bicycle quickly took the object and put it in his pocket." The detectives observing the two men were not able to determine exactly what was transferred,

---

1. Unless otherwise noted, all factual quotations are from testimony by the officers at the suppression hearing.

2. Ward later testified that he did not believe Dick was carrying anything when he left the store.

but team members believed that a drug transaction had just occurred. Thus, Detectives Massey and Mazan advised that they would try "to stop and make contact" with Hoffman, who rode off on the bicycle, while Detectives Ward and Stricklin would attempt "to make contact" with Dick, who left on foot.[3]

Ward and Stricklin each drove off in their unmarked cars and caught up with Dick who was walking down an alley behind Church Road. Ward drove his car into the alley until he was in front of Dick, while Stricklin pulled into the mouth of the alley to the rear of the suspect.[4] Ward exited his vehicle, and with the door open, stood between the door and the interior of the car about three feet from Dick. He identified himself as a police officer "with verbal commands." Ward was also wearing his badge on a chain around his neck. Neither Ward nor Stricklin drew their weapons. Ward later testified in response to a question from the court that at that point, he said to Dick that "my team had just witnessed him do a drug transaction . . . up the street a little ways." [5] Dick responded that he did not know what the detective was talking about. Then, as Ward "attempted to make contact with him," Dick pushed him in the chest and "took off running." [6] The suspect ran out of the alley and for another 20 yards. He attempted to hop a split rail fence that collapsed under his weight and he fell to the ground. When Dick refused Ward's order to put his hands behind his back, the two struggled. Stricklin arrived, and the two officers were able to subdue

---

**3.** Ward later testified that "to make contact" with the suspect meant to "speak to him."

**4.** Ward testified that the alley was "maybe" 12–14 feet wide.

**5.** Earlier testimony by Ward at the suppression hearing spoke in more general, less accusatory terms, *e.g.* that Dick was told that "we had just witnessed a drug deal." The detective's later testimony is more consistent with a statement contained in the Statement of Probable Cause that he prepared on the day of the encounter ("The undersigned advised the white male on foot that his team had just observed him make a drug sale to a white male on a bicycle.")

**6.** Detective Stricklin was 10–15 feet away from Dick, and moved forward when Dick began to run.

Dick and place him under arrest. Then, Ward searched him and found in the suspect's pants pocket a clear sandwich bag containing 34 individually packaged baggies of crack cocaine and $220 in cash.

## II.

Dick moved to suppress this evidence, arguing that he had been unconstitutionally seized because, under the circumstances of his initial encounter with the police, a reasonable person would believe he was not free to leave.[7] The State countered that the police had made an investigatory stop of Dick based on reasonable suspicion that criminal activity was afoot and that, in any event, the officers had probable cause to arrest him.

At the suppression hearing, only Detectives Ward and Stricklin testified. Thus, Dick's version of the encounter was not presented to the court. A major subject of inquiry at the hearing was whether the police cars had "blocked" Dick. The following exchange occurred between defense counsel and Detective Ward:

Q. And, and what was the purpose in driving one car to one side and one to the other?

A. Just to make contact with Mr. Dick. I mean speak with him.

Q. I see. It wasn't, I, cause I used the word block. It wasn't to block him in?

A. No sir, there was, there was definitely enough room that Mr. Dick could have passed. It wasn't like we pulled the bumpers up to the fences of the, of the residences,—

Q. Okay.

A. —where no one could pass.

---

7. Appellee, who at the time was represented by private counsel, not the Public Defender, relied primarily on the decision of the Court of Appeals in *State v. Lemmon,* 318 Md. 365, 568 A.2d 48 (1990), discussed, *infra.* at pp. 703–04, 957 A.2d at p. 156.

When asked about whether Dick had to push Ward aside to leave the alley, Ward testified that Dick pushed him "just to make room between me and him so he could start to run" and that "he made room to put distance between myself and him."

When Stricklin testified, the following exchange occurred between the officer and defense counsel:

Q. And so at that point Detective Ward goes to the front of Mr. Dick and you're at the rear?

A. Yes sir.

Q. Okay. You got em blocked in?

A. Yes.

Q. Right?

A. Well I, we were in vehicles. So we—

Q. Look, I, I understand that.

A. Yes. Well I was at the rear and Detective Ward was in the front.

Q. That was, that was in case he turned and went the other way you would be blocking him in,—

A. Yes

Q. —to grab him. Right?

A. Yes.

Q. So once you heard this transmission, the idea was to go and to get Mr. Dick. Right?

A. Yes.

Q. Okay. Now you, I mean you, you all didn't sit there and formulate a plan that you'll do this and I'll do that. But I guess having worked together in the past you sort of could anticipate what to do?

A. Yes. They, we advised each other on the radio that Detective Massey and Mazan would approach the gentleman on the bike, and myself and Detective Ward would approach Mr. Dick.

Q. All right. You used the word approach.

A. Yes.

Q. Is that what the word you used in the, in your transmissions?

A. I don't, I don't recall exactly what was said.

Q. Okay.

A. Stop maybe.

Q. Stop. All right. I have no other questions Your Honor.

On January 11, 2008, the court issued a Memorandum Opinion and Order granting Dick's motion to suppress. The opinion, relying on *State v. Lemmon, supra,* framed the issues as whether appellee had been lawfully seized and whether under the circumstances, a reasonable person would have believed he was not free to leave. The court said:

> In the instant case, the Defendant's freedom of movement was restricted by the positioning of the police vehicles on either side of his person within the confines of a narrow alley. Further, the Defendant was approached by an officer in this situation and asked about a recent narcotics transaction. A reasonable person surrounded by police vehicles to his front and rear in a narrow alley and then questioned by an officer about a narcotics transaction would not feel free to walk away from that situation. That Defendant did not feel free to leave in these circumstances is further evidenced by the fact that Defendant pushed one of the officers in an attempt to leave the alley. Therefore, Defendant was seized within the meaning of the Fourth Amendment.
>
> Here, the seizure of the Defendant was not reasonable under the totality of the circumstances. The only activity the arresting officers observed was that of the Defendant meeting with the individual on the bicycle, walking toward the gas station, entering and exiting the convenience store, and proceeding down a small street. Thereafter, the officers acted pursuant to a call over police radio informing them that other officers had observed the occurrence of a narcotics transaction involving two individuals whose descriptions matched those of the Defendant and the individual on the bicycle.[8]

Finally, the court noted:

---

**8.** In the court's opinion, the "pushing" incident was described as "an attempt to get around" Ward "because without doing so, the Defendant

Under these facts, the officers had the requisite reasonable suspicion to effectuate an investigative stop, but did not have a reasonable basis for seizing the Defendant to the extent that he did not feel free to leave.

The State timely noted an appeal of the circuit court decision, pursuant to Maryland Code (1973, 2006 Repl.Vol.), Courts & Judicial Proceedings Article, § 12–302(c).

## III.

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." However, this constitutional proscription is not a guarantee against all searches and seizures, only those that are unreasonable. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

In *Swift v. State*, 393 Md. 139, 899 A.2d 867 (2006), the Court of Appeals analyzed the applicability of the Fourth Amendment in terms of three tiers of interaction between a citizen and the police:

> The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. . . . The second category, the investigatory stop or detention, known commonly as a *Terry* stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual. . . . The least intrusive police-citizen contact, a consensual encounter, . . . involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. (citations omitted). *Id.* at 150–51, 899 A.2d 867.

---

could not have run down the alley." The court also said that the officers' goal was to "stop" Dick.

 Further complicating the three-tiered approach are the oft-litigated questions of whether a police "encounter" or "accosting" has escalated into a "seizure", *see, e.g., Trott v. State,* 138 Md.App. 89, 770 A.2d 1045 (2001), and whether an "investigatory stop" has ripened into an "arrest", *see, e.g., Longshore v. State,* 399 Md. 486, 924 A.2d 1129 (2007). The former issue often turns on whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *California v. Hodari D.,* 499 U.S. 621, 627–28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). The latter question is determined on the basis of whether the investigatory stop was justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place and did not continue for an excessive period of time or resemble a traditional arrest. *Hiibel v. Sixth Judicial District Court of Nevada,* 542 U.S. 177, 185–86, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004).

 The opinion of the circuit court appears to have confused these categories in its statement that "the officers had the requisite reasonable suspicion to effectuate an investigatory stop, but did not have a reasonable basis for seizing the Defendant to the extent that he did not feel free to leave", and in its reliance on *State v. Lemmon, supra.* An investigatory stop, like an arrest, is a seizure of the person. *See Swift v. State, supra,* 393 Md. at 150, 899 A.2d 867.[9] Moreover, unlike a consensual encounter, where a person is free to leave, one subject to an investigatory stop is not. As noted by Judge Moylan in *Carter v. State,* 143 Md.App. 670, 677, 795 A.2d 790 (2002):

> The appellant solemnly insists that he "was not free to leave." Of course, he wasn't. That's why this was a *Terry* stop requiring the *Terry* level of Fourth Amendment justification. Had he been free to leave, this would have been a mere accosting and the Fourth Amendment would not even

---

9. The State concedes in its brief that a seizure of Dick had occurred.

have been implicated. Under *Terry*, a stoppee's freedom of movement is most definitely restricted under the command of the law.

It necessarily follows that a suspect has no right to react to a *Terry* stop by fleeing. *See n.* 18, *infra.*

In *Lemmon*, the State attempted to justify an "investigatory pursuit" on alternative theories, *viz.* 1) that, as in an accosting, no seizure had occurred; and 2) that if treated as an investigatory stop, it was supported by reasonable suspicion. *Lemmon*, 318 Md. at 368, 568 A.2d 48. The Court of Appeals rejected both contentions. *Id.* Here, in contradictory fashion, the circuit court declared the *Lemmon* Court's finding that reasonable suspicion did not exist "controlling," even though in Dick's case, it said "the officers had the requisite reasonable suspicion to effectuate an investigative stop." [10]

■ Perhaps the circuit court really meant to say that reasonable suspicion did not exist to justify an investigatory stop or that the circumstances of the encounter had transformed a stop into an arrest. Nevertheless, we need not put words in the court's mouth, because "[a]n appellate court . . . under an independent *de novo* review standard, must consider the application of the law to those facts in determining whether the evidence at issue was obtained in violation of the law, and, accordingly should be suppressed." *Longshore, supra*, 399 Md. at 499, 924 A.2d 1129.

## IV.

First, we consider whether Dick was lawfully stopped in the alley behind Church Road by police officers who had a reasonable, articulable suspicion of criminal activity.[11] In *United*

10. In Part IV of this opinion, we will consider the "reasonable suspicion" aspect of *Lemmon*.

11. Our review of this question is limited to the record of the suppression hearing and typically, we give deference to the trial court's factual findings, unless they are clearly erroneous. *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002). In addition, we review the facts in the

*States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the U.S. Supreme Court said that under this standard:

> The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" The Fourth Amendment requires "some minimal level of objective justification" for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," and the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause. (citations omitted).

However, "reasonable suspicion" is still "a common sense, non-technical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Stokes v. State*, 362 Md. 407, 415, 765 A.2d 612 (2001). If "under the totality of circumstances, a police officer has a particularized and objective basis for suspecting criminal activity by the person stopped, then the stop and temporary detention is justified." *Longshore, supra*, 399 Md. at 507, 924 A.2d 1129. Finally, an investigatory stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

In our opinion, prior to Dick's flight and at the time of the stop, the police had reasonable suspicion that he was involved in illegal drug activity. The police officers were specialists in drug enforcement. The area and the specific location under surveillance were known for illegal drug activity and, in fact, two of the officers had previously arrested persons at the gas station for such crimes. *Contrast Lem-*

---

light most favorable to the prevailing party, appellee. *Id.* Of course here, we do not have Dick's version of the encounter, just police testimony, and there are no factual clashes or credibility issues. For this reason, we need not decide whether the circuit court's misstatement of the relevant Fourth Amendment inquiry undercuts deference to its factual findings.

*mon, supra,* 318 Md. at 380, 568 A.2d 48. The location was not a recreational area or meeting place, so that Hoffman's persistent bicycle riding and apparent wait for someone was out of the ordinary. The quick hand-to-hand transaction in an area more remote than the gas station, although not positively identified as a drug sale, was more than two men talking. *Contrast Lemmon, supra,* 318 Md. at 379–80, 568 A.2d 48. It was recognized by the officers as characteristic of such illegal activity.[12] Although Ward and Stricklin did not see the transaction themselves, they were not acting upon an anonymous tip, but upon eye-witness information received from fellow officers, who also knew the hallmarks of drug activity. *Contrast Lemmon, supra,* 318 Md. at 379, 568 A.2d 48. In addition, there were reasons to make a stop. Ward and Stricklin did not know which of the two suspects was the buyer or seller or whether either displayed signs of using drugs, and a brief delay, while the other officers confronted Hoffman, could have provided vital information. Clearly, the police were acting "in a swiftly developing situation." *United States v. Sharpe, supra,* 470 U.S. at 686, 105 S.Ct. 1568. Finally, the stop itself was for the briefest of periods.

Thus, we believe the record supports the conclusion that reasonable articulable suspicion existed to support the stop at its inception.

## V.

We now consider whether the stop, although justified at its inception, was nevertheless not reasonably related in scope to the circumstances which justified the interference in the first place. *See United States v. Sharpe, supra,* 470 U.S. at 682, 105 S.Ct. 1568. Similar to the question of whether the scope of the stop had been exceeded is whether the investigative

---

12. In the Statement of Probable Cause, after describing the hand-to-hand transaction, Detective Ward said that "[t]he undersigned knows through his training, knowledge and experience that this type of 'quick' meeting is a common method that drug dealers utilize to consummate drug sales."

techniques utilized in the encounter transformed the stop into an arrest requiring the showing of probable cause. *Id.* at 685, 105 S.Ct. 1568.[13]

Supreme Court cases have characterized the inquiry as whether the detention "was in important respects indistinguishable from a traditional arrest," *Dunaway v. New York*, 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), or "resembled a traditional arrest," *Hiibel v. Sixth Judicial District Court of Nevada, supra,* 542 U.S. at 185, 124 S.Ct. 2451. The Court of Appeals has said that "[i]n determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the 'totality of circumstances.'" *In re David S.*, 367 Md. 523, 535, 789 A.2d 607 (2002). In addition, this Court in *Johnson v. State*, 154 Md.App. 286, 297, 839 A.2d 769 (2003) said:

> A *Terry* stop is distinguishable from an arrest in three important respects; the length of the detention, the investigative activities that occur during the detention, and the question of whether the suspect is removed from the place of the stop to another location.

Some courts have fashioned a "laundry list" of relevant circumstances to govern the inquiry. For example, in *United States v. Vargas*, 369 F.3d 98, 101 (2d. Cir.2004), the U.S. Court of Appeals for the Second Circuit said:

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." (internal quotation marks and citations omitted).[14]

---

**13.** While not conceding that probable cause did not exist at the time of the stop, the State devotes little argument to the issue.

**14.** In *Ferris v. State*, 355 Md. 356, 377, 735 A.2d 491 (1999), the Court of Appeals compiled a similar laundry list to distinguish a consensual encounter from a seizure.

In *Longshore v. State, supra,* the Court of Appeals addressed a *de facto* arrest issue in the case of a suspected drug offender who was asked to step out of his car and was handcuffed during an alleged investigatory stop. Distinguishing a number of earlier appellate decisions, where the stop was based on flight and safety concerns, the Court said the stop was no mere detention, but became an arrest when the defendant was handcuffed. 399 Md. at 514–20, 924 A.2d 1129. Specifically, the Court said:

> [W]e hold that Longshore was arrested when he was asked to step out of the car and placed in handcuffs, and that *no special circumstances existed* that justified the police officers placing him in handcuffs. The officers conceded that he was stopped because they believed him to possess drugs. Unlike the circumstances in *In re David S.,* there was no suspicion that a violent crime had occurred, nor any reason to believe that Longshore was armed or dangerous. The arresting officer acknowledged that, despite Longshore's nervousness, he was cooperative and did not exhibit any threatening behavior. The officers did not indicate that they were, in any way, concerned for their safety. Moreover, there was no reason to believe that Longshore was a flight risk. There was no indication by the police that they believed, nor any objective basis for concluding, that Longshore would run. In addition, the incident occurred in the middle of the day, not at 3:30 a.m. as in *Trott* [v. *State,* 138 Md.App. 89, 770 A.2d 1045 (2001)]. *Id.* at 513, 924 A.2d 1129. (emphasis in original)

 Dick can point to some of these factors here. He was not suspected of a violent crime or of being armed. The time of day was not a suspicious fact.[15] In addition, Detective

---

15. The circuit court opinion placed some emphasis on the statement of Detective Stricklin that the officers sought to "stop" the appellee. *See* pages 700–02, 957 A.2d at pages 154–55, *supra.* However, the subjective intention of the police officers to make a full-fledged arrest is irrelevant and does not transform a *Terry* stop into an arrest. *See United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); and *LaFave, Search and Seizures* (4th Ed., 2004) at § 9.2(e).

Ward told him that in apparently accusatory terms they had "just witnessed *him* do a drug transaction" (Emphasis added).[16] However, "whether the police indicated that the person was suspected of a crime," *Ferris v. State, supra,* 355 Md. at 377, 735 A.2d 491 is one factor that courts consider when determining whether a consensual encounter has become a seizure. As such, it is not conclusive on whether a lesser seizure, the stop, has become a greater seizure, an arrest.

The most critical fact in the view of the circuit court was that Dick's "freedom of movement was [so] restricted by the positioning of the police vehicles on either side of his person within the confines of a narrow alley" that without pushing Detective Ward "he could not have run down the alley." However, in *Swift v. State, supra,* 393 Md. at 150, 899 A.2d 867, the Court of Appeals said that "blocking the citizen's path" may occur when a person is seized in a *Terry* stop. Because during the brief period of such an investigatory stop, the subject is not free to go, the fact that the vehicles blocked Dick from leaving is not conclusive in finding that an arrest had occurred. In short, a blocking vehicle is not the motorized equivalent of handcuffing. *See Longshore, supra,* 399 Md. at 512–14, 924 A.2d 1129.[17] In this case, the conduct of

---

16. The circuit court's opinion states that "[a]ccording to the testimony of one officer, the officers told the defendant that they had just witnessed a drug transaction." The quoted testimony from the suppression hearing appears more accusatory. However, it is not clear whether at the time of the stop the officer was stating a fact or trying to elicit some reaction from Dick.

17. A survey of cases in other jurisdictions where a stop was found to be an arrest because a vehicle had blocked the suspect's path, other oppressive elements were present. *See e.g., United States v. Anderson,* 981 F.2d 1560 (10th Cir.1992)(Two cars blocked defendant's egress and agent approached him with his gun drawn.); *United States v. Strickler,* 490 F.2d 378 (9th Cir.1974)(Arrest was complete when Strickland was enclosed by police vehicles and confronted with official orders made at gunpoint.); and *United States v. Sanchez,* 719 F.Supp. 128 (E.D.N.Y.1989)(After stopping a police car in front of the suspect's Honda, agents with guns drawn surrounded the car.) *See also LaFave, Search and Seizure* (4th Ed.2004) at § 9.2(d)("The correct view, then, is that an otherwise valid stop is not inevitably rendered unreasonable

the officers was not otherwise intrusive or excessively forceful. Before Dick's flight, he was not touched by the police. Officers did not draw their guns. Ward, who was three feet from appellee, might have made an accusation, but did not shout threatening orders. The suspect was not removed to a police station or to a police vehicle and at the time of the stop was not handcuffed. Most importantly, his freedom was limited for the briefest of moments before he decided to flee.

Considering the totality of circumstances, we believe the officers did not exceed the scope of a *Terry* stop and their actions did not elevate the stop into an arrest.

## VI.

After hearing an accusation of illegal drug activity, Dick pushed Detective Ward and tried to flee the scene, enhancing the officers' existing suspicion to warrant an arrest. *See Collins v. State,* 376 Md. 359, 373, 829 A.2d 992 (2003). In addition, he struck the officer, thus committing a criminal offense.[18] Under these circumstances, there was ample probable cause for the police to arrest him. The drugs and money later taken from his person were items seized incident to arrest. Their seizure did not violate the Fourth Amendment. For these reasons, we reverse the suppression order of the circuit court and remand the case for trial.

**JUDGMENT REVERSED. CASE REMANDED FOR TRIAL. COSTS TO BE PAID BY APPELLEE.**

---

merely because the suspect's car was boxed in by police cars in order to prevent it from being moved, though sometimes the magnitude of such police activity will compel the conclusion an arrest had occurred.")

**18.** Dick argues that he had a right to reasonably resist an unlawful arrest. *See State v. Wiegmann,* 350 Md. 585, 714 A.2d 841 (1998). However, he had no right to resist even an invalid investigatory stop. *See Barnhard v. State,* 86 Md.App. 518, 587 A.2d 561 (1991), *aff'd.* 325 Md. 602, 602 A.2d 701 (1992). And here we have determined that the stop was constitutionally permissible.